Filed 7/10/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S211702 |
| v. | ) | |
| | ) | Ct.App. 4/3 G046129 |
| REYNALDO JUNIOR EID et al., | ) | |
| | ) | Orange County |
| Defendants and Appellants. | ) | Super. Ct. No. 05HF2101 |
| _____ | ) | |

Defendants were charged with kidnapping for ransom, which is punishable by life in prison. The jury instead convicted each of them of two lesser included offenses — felony attempted extortion and misdemeanor false imprisonment — which resulted in a sentence of four and a half years in custody. The Court of Appeal held that each defendant could be convicted of only one lesser included offense and struck the convictions for misdemeanor false imprisonment, thus reducing each defendant's sentence to two and a half years. As explained below, defendants were properly convicted of both lesser included offenses. Accordingly, we reverse the Court of Appeal.

## I.

Defendants Reynaldo Junior Eid and Alaor Docarmo Oliveira were convicted in previous proceedings of kidnapping for ransom, but their convictions were reversed for instructional error. (*People v. Eid* (2010) 187 Cal.App.4th 859; *People v. Oliveira* (Aug. 19, 2010, G042004) [nonpub. opn.].) Defendants were

then charged in an amended information in the present case with two counts of kidnapping for ransom of Ana and Iago Ribeiro. (Pen. Code, § 209, subd. (a); all undesignated statutory references are to this code.)

The evidence at trial showed that Jefferson Ribeiro moved to Florida from Brazil in November 2004. He had a six-month tourist visa but planned to stay in the United States indefinitely. In the middle of 2005, Jefferson met Mauricio Freitas and agreed to pay him $18,000 to arrange for his wife, Ana, and their young son, Iago, to illegally enter the United States from Brazil. Jefferson paid Freitas $4,000 as a downpayment and agreed to pay the balance in monthly installments of $1,000.

On October 16, 2005, Ana and Iago flew from Brazil to Mexico City, where they stayed in a house for 7 to 10 days with about 40 other Brazilians who were waiting to cross into the United States. She was locked in the house but stayed there willingly to avoid the police. She felt safe and did not feel threatened, even though she was told that her son would not be fed until Jefferson sent more money. Based on warnings Ana received at the house, she believed that if the police saw her, they would separate her from her son.

Meanwhile, in Florida, Freitas repeatedly asked Jefferson for more money, explaining that there were "problems with the trip" and things were not going "according to the plan." Jefferson paid Freitas a total of around $13,000 in additional cash because if he did not, Ana and their son would remain "where they were." At some point, Jefferson lost contact with Freitas and could not reach him at his home or by phone.

Despite threats by the proprietor of the house in Mexico to send Ana and Iago back to Brazil because Jefferson had not paid enough money, Ana and Iago were smuggled across the border into the United States hidden under the seat of a

2

truck. They were then taken by another person to a gas station where they were picked up by defendants in a van driven by Eid, whom Ana knew as "Junior." Defendants took Ana and Iago to a restaurant and then to the Costa Mesa Travelodge, where the four of them initially stayed in one motel room. At that point, Ana's journey had taken about 35 days.

Defendants treated Ana well at first. They let her use the motel laundry facility and talk with Jefferson on Eid's cell phone. They took Iago to get a haircut. Once, Ana went with Oliveira to a computer store and then to get some food. Oliveira bought a computer and let Ana use it once. Defendants paid for food, laundry, and the motel room.

Defendants said they were waiting for more people to arrive from Mexico. After the second day at the motel, another woman, Monica Lino, arrived, and the group moved into two rooms connected by a door. Ana, Iago, and Lino stayed in one room and defendants stayed in the other. Defendants ordered Ana never to close the door between the two rooms.

One or two days later, Jefferson received a phone call from Junior asking for $14,000 to release Ana and her son. Jefferson offered to pay $1,000 a month. Junior rejected the proposal but said he would accept half the money up front and the balance in installments. Jefferson did not agree because he did not have the money. Junior gave Jefferson his cell phone number and the motel's phone number.

Jefferson later spoke to Ana by phone and told her that defendants had asked for $14,000 to send her and Iago to Florida. Ana felt afraid because she knew that she and Jefferson had no more money. Jefferson asked Ana if she could escape, but she said, "No way." Ana no longer wanted to stay with defendants; she wanted to go to Florida. She felt she could not contact the police "because it

3

could be dangerous" and knew it would be difficult for her to leave because she had no money, did not speak English, and did not know where she was.

Defendants told Ana that if Jefferson failed to pay by the next day, they would take her to New York to work for them to pay off the debt. Eid removed Ana's and Iago's passports from Ana's purse, saying he needed the passports to buy their plane tickets to Florida. When Ana told Jefferson that defendants had taken the passports, he located the address of the motel and learned that a neighbor had a friend named Vanessa Silva who lived nearby. Silva and her boyfriend, who was identified only as Rudson, agreed to go to the motel to see if Ana and her son were there.

Jefferson phoned Ana, told her that Silva and Rudson were coming to the motel, and instructed Ana to leave with them if she could. Silva also called Ana and told her they would "pick her up at the hotel so she could be taken to the airport." That night, Ana heard a knock on the door and got up to open it, but Oliveira did so first. A man and a woman stood outside. The woman said she was there to pick up Ana and her son. Eid came from the other room and asked what they were doing there. Eid argued with the woman in a loud voice, saying that "he was owed money and nobody was leaving until he got paid." Silva announced that she was going to call the police. She phoned 911 and reported that two men would not let her friend leave a Travelodge room and were demanding payment.

Eid shut the door, yelled at Ana, Iago, and Lino to gather their belongings, and said they were leaving. He told Ana they should have never done that and they were in hot water. Ana gathered her possessions while Eid went to the motel lobby to check out. Oliveira forcefully grabbed Ana's upper arm, and Eid did the

4

same with Lino.  After pushing them into the van, defendants told them to lie down on the seat and to say they were on vacation if the police asked.

A police car dispatched to the scene blocked the motel's driveway and detained defendants.  When interviewed by a Spanish-speaking police officer, Ana said in Brazilian Portuguese that she was being held against her will.  Behind a seat in the van, the police found a knife that was inaccessible to the driver.

The jury was instructed that defendants "are charged in Counts 1 & 2 with kidnapping for the purpose of ransom or extortion" and that the prosecution had to prove that (1) defendants "kidnapped, confined, or concealed another person" and (2) "held or detained the other person" (3) "for ransom, to commit extortion, or to get money or something valuable"; that (4) "[t]he other person did not consent"; and that (5) defendants "did not actually and reasonably believe that the other person consented . . . ."

Further, the jury was instructed that four crimes were lesser included offenses of kidnapping for ransom:  kidnapping, attempted extortion, felony false imprisonment, and misdemeanor false imprisonment.  The jury also was told that "[i]f all of you find that the defendant is not guilty of a charged crime, you may find him guilty of a lesser crime" but that a "defendant may not be convicted of both a charged and lesser crime for the same conduct."  The instruction continued: "If all of you agree that the People have not proved beyond a reasonable doubt that the defendant is guilty of the charged crime and you also agree that the People have proved beyond a reasonable doubt that he is guilty of a lesser crime, complete and sign the verdict form for not guilty of the charged crime and the verdict form for guilty of the lesser crime."

The jury found defendants not guilty of kidnapping for ransom but guilty of the lesser included crimes of attempted extortion and misdemeanor false imprisonment. The jury did not complete the verdict forms for the lesser included offenses of simple kidnapping and felony false imprisonment.

Neither defendant objected at trial to being convicted of two lesser included offenses, and Oliveira filed a sentencing brief that argued he could be sentenced to a maximum of two years and six months in prison for attempted extortion and an additional two years for misdemeanor false imprisonment. At the sentencing hearing, neither defense counsel questioned whether defendants could be convicted of both lesser included offenses, and both counsel agreed that the maximum possible sentence for each defendant was four years and six months.

The trial court sentenced each defendant to the maximum period of four years and six months. Each defendant had been in custody for six years at that point, but they were not released because each had a federal immigration hold. The court also ordered each defendant to pay restitution in the amount of $5,020.

Defendants argued for the first time on appeal that they could not be convicted of two lesser included offenses of a single greater offense. The Court of Appeal agreed and struck defendants' convictions for misdemeanor false imprisonment, thus reducing their sentences from four and a half years to two and a half years each. Relying on our decision in *People v. Navarro* (2007) 40 Cal.4th 668, 674–675 (*Navarro*), the Court of Appeal held that "the jury's conviction, of defendants, for two uncharged lesser included offenses of a single charged crime was *not* statutorily authorized." We granted review.

**II.**

A charged offense may include more than one lesser offense. A trial court has a sua sponte duty to "giv[e] instructions on lesser included offenses when the

6

evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) In the present case, the parties agree that both attempted extortion and false imprisonment are necessarily included offenses of kidnapping for ransom. (See *People v. Serrano* (1992) 11 Cal.App.4th 1672, 1677; *People v. Chacon* (1995) 37 Cal.App.4th 52, 65.) The parties further agree that neither attempted extortion nor misdemeanor false imprisonment is included within the other because it is possible to commit either offense without committing the other. And there is no dispute that the trial court properly instructed the jury on multiple uncharged lesser included offenses in light of the evidence. The question here is whether the jury may convict on more than one uncharged lesser included offense of a single charged greater offense.

Where a charged offense necessarily includes multiple lesser offenses, it is often the case that the lesser offenses are, in hierarchical fashion, also lesser included offenses of each other. In such circumstances, the defendant may be convicted of only one offense because of the rule prohibiting convictions on both a greater offense and a lesser included offense. (See *People v. Sanders* (2012) 55 Cal.4th 731, 736; *People v. Tideman* (1962) 57 Cal.2d 574, 582.) This case is unusual: The two lesser offenses are included within the charged offense, but neither lesser offense is an included offense of the other.

Section 1159 provides that "[t]he jury . . . may find the defendant guilty of *any offense*, the commission of which is necessarily included in that with which he is charged . . . ." (Italics added.) The parties debate whether the term "any offense" in section 1159 is singular or plural. Defendants argue that the term, on its face, is singular and "means one." The Attorney General contends that "any

7

offense" in section 1159 is properly read to mean "all offenses," relying on the general provision that in penal statutes, "the singular includes the plural, and the plural the singular." (§ 7.) The Attorney General also relies on *United States v. Lacy* (3d Cir. 2006) 446 F.3d 448 (*Lacy*), which construed the term "any offence" in a federal statute similar to section 1159 to mean that "a defendant may be found guilty of several offenses other than that charged in the indictment . . . ." (*Lacy*, at p. 452.)

In common usage, the word "any" is susceptible of either singular or plural meaning depending on context. Section 1159 certainly may be read to authorize conviction of multiple offenses necessarily included in a charged offense. But the text alone does not inexorably compel this reading, and we have said the general rule of section 7 is a "slim reed" for resolving such issues. (*Navarro*, *supra*, 40 Cal.4th at p. 680.) The better argument for construing "any offense" in section 1159 to have a plural meaning lies in the considerations that inform the trial court's duty to instruct on lesser included offenses.

The reason for instructing the jury on lesser included offenses is to protect the jury's " 'truth-ascertainment function.' " (*Breverman*, *supra*, 19 Cal.4th at p. 155.) A jury instructed on only the charged offense might be tempted to convict the defendant "of a greater offense than that established by the evidence" rather than acquit the defendant altogether, or it may be forced to acquit the defendant because the charged crime is not proven even though the "evidence is sufficient to establish a lesser included offense." (*Ibid.*) Instructing the jury on lesser included offenses avoids presenting the jury with "an 'unwarranted all-or-nothing choice' " (*ibid.*), thereby "protect[ing] both the defendant and the prosecution against a verdict contrary to the evidence" (*id.* at p. 161).

8

The purposes underlying the rule requiring instruction on lesser included offenses are served by allowing the jury to convict on more than one lesser offense if, in the jury's determination, such convictions more accurately reflect the defendant's culpability in light of the evidence. The facts here present an example of why this is so. Defendants were charged with kidnapping for ransom, a serious offense that carries a sentence of life in prison. (§ 209, subd. (a).) But the crime in this case was not a standard kidnapping. The victims had submitted themselves, at least initially, into the defendants' care in order to enter this country unlawfully. The evidence indicated that this initially voluntary arrangement changed to the point that the victims were held against their will and defendants were demanding money for their release. The jury was tasked with determining the nature of defendants' actions and assessing their culpability.

The trial court properly instructed the jury that it could convict defendants of the charged offense as well as any of four lesser included offenses: kidnapping, attempted extortion, felony false imprisonment, and misdemeanor false imprisonment. The jury chose to convict defendants of two lesser offenses, attempted extortion and misdemeanor false imprisonment, rather than the charged offense. The jury's verdict acknowledged that although defendants had not kidnapped the victims and held them for ransom, they had held the victims against their will and attempted to extort money from their family. By convicting defendants of two lesser included offenses, the jury tailored its verdict to reflect its determination of the full extent of defendants' criminal acts.

A jury without an option to convict a defendant of a lesser included offense might be tempted to convict the defendant of an offense greater than that established by the evidence instead of rendering an acquittal. By the same logic, a jury that believed a defendant had committed two lesser included offenses but was

allowed to convict on only one may feel the verdict is inadequate to reflect the defendant's actual culpability and thus may be tempted to convict the defendant of the charged greater offense, even though it was not established by the evidence. Allowing the jury in this case to convict defendants of the two lesser included offenses that were established by the evidence enabled the jury to calibrate defendants' culpability properly.

In ruling that defendants could be convicted of only one lesser included offense, the Court of Appeal relied upon our decision in *Navarro*, which held that an appellate court that finds insufficient evidence to support a conviction for one greater offense may not substitute convictions on two lesser included offenses. (*Navarro*, *supra*, 40 Cal.4th at pp. 674–675.)  But our decision in *Navarro* involved statutes that do not apply here.

*Navarro* interpreted section 1181, subdivision 6, which permits a trial court ruling on a motion for new trial or an appellate court deciding an appeal to modify a verdict or judgment "if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein . . . ."  In consistent fashion, section 1260 provides that an appellate court "may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed . . . ."  Under these statutes, "an appellate court may modify a verdict to reflect a conviction of a lesser included offense where insufficient evidence supports the conviction on the greater offense . . . ." (*Navarro*, *supra*, 40 Cal.4th at p. 678.)

The defendant in *Navarro* was convicted of attempted kidnapping during the commission of a carjacking, but the Court of Appeal reversed the judgment because there was insufficient evidence of a completed carjacking.  Rather than

10

remand the matter for a new trial, the Court of Appeal modified the judgment to reflect convictions on two lesser included offenses:  attempted carjacking and attempted simple kidnapping.  (*Navarro*, *supra*, 40 Cal.4th at pp. 673–674.)  This court reversed the judgment of the Court of Appeal.

We described the case as presenting a "narrow question" and held that the Court of Appeal's modification of the judgment was not authorized by statute. (*Navarro*, *supra*, 40 Cal.4th at p. 675.)  Recognizing that "an appellate court's power to modify a judgment is purely statutory" (*id*. at p. 678), we relied heavily on the legislative history of the statutes involved.  We observed that "section 1181, subdivision 6, and later section 1260, have been understood to provide courts a mechanism for correcting the jury's error in 'fix[ing] the degree of the crime' " (*id*. at p. 679) and not a general license to modify verdicts in accordance with the evidence.  The Legislature enacted section 1181, subdivision 6, "for the purpose of overturning the result in [*People v. Nagy* (1926) 199 Cal. 235], in which the court acknowledged that it may be appropriate under some circumstances to modify a judgment to reflect a conviction of a *single* lesser included offense shown by the evidence, but concluded it lacked the authority to do so."  (*Navarro*, at p. 679.) Because *Nagy* was "a case involving a one-for-one modification," and because section 1181, subdivision 6, was enacted "to solve the problem presented in *Nagy*," we declined "to expand the statute beyond the scope of its evident purpose."  (*Navarro*, at p. 679.)  Neither of the statutes interpreted in *Navarro* is at issue in this case.

The Court of Appeal, in discussing *Navarro*, said, "It would be anomalous to allow a jury to do what the judge may not, i.e., to conclude that the evidence does not sustain a conviction on the greater offense, but then to convict on more than one lesser included offense."  But given the inherent differences in the nature

11

of the powers exercised by a jury in determining the guilt of an accused and a reviewing court in determining the validity of a judgment, it is hardly surprising that the Legislature would treat these situations differently. As noted, a jury may choose to find the defendant guilty of more than one lesser included offense in order to calibrate the verdict to reflect the full measure of the defendant's culpability. By contrast, a reviewing court, which has no direct factfinding role, is not in a similar position to determine whether substituting more than one lesser included offense for a conviction that is unsupported by substantial evidence would more accurately reflect the defendant's culpability. As *Navarro* explained, the Legislature restricted the reviewing court to the "corrective function" of "replac[ing] a single greater offense with a single lesser offense . . . ." (*Navarro*, *supra*, 40 Cal.4th at p. 679.) This limitation does not apply here; a jury determining the extent of a defendant's culpability in the first instance exercises no similar corrective function.

Defendants and the Attorney General observe that section 954 states, "the defendant may be convicted of any number of the offenses charged." The Attorney General contends that section 954 indicates a general policy that a defendant may be convicted of multiple offenses arising out of a single act or course of conduct. Defendants, by contrast, contend that section 954 authorizes multiple convictions of *charged* offenses, not *uncharged* offenses. But defendants do not contend that they lacked notice of all lesser included offenses of the charged offense here. Because a charged offense puts a defendant on notice of all uncharged lesser included offenses (*People v. Reed* (2006) 38 Cal.4th 1224, 1227), defendants had notice of, and the opportunity to defend against, the two uncharged lesser included offenses of which they were convicted, and they were never at risk of being convicted of multiple lesser offenses that were necessarily included in

12

another. (Accord, *Lacy*, *supra*, 446 F.3d at p. 452.) Thus, defendants' precise claim is that they were entitled to notice of the *number* of convictions they faced if that number could be greater than one.

However, defendants marshal no authority for this claim or any argument that outweighs the truth-seeking purpose of instructing and authorizing convictions on multiple lesser included offenses. Defendants do not contend, for example, that their lack of notice as to the number of possible convictions on lesser included offenses implicated the Three Strikes law or resulted in a sentence greater than what could be imposed upon conviction of the charged greater offense. Even if such scenarios could arise under our penal statutes, we express no view on them here. Defendants had notice of all the lesser included offenses of the charged greater offense, and they could not have been convicted of any subset of lesser offenses that encompassed one offense necessarily included in another. Defendants were not additionally entitled to notice of the number of convictions they faced.

Finally, defendants contend that convictions of multiple lesser offenses are permissible under section 954 so long as the prosecution charges them along with the greater offense in the accusatory pleading. But the rule urged by defendants would force the prosecution, before trial, to either charge one or more lesser included offenses or else forgo any conviction on more than one lesser offense regardless of what the evidence ultimately showed as to the defendant's culpability. This is not preferable to allowing the court to instruct the jury on only those lesser included offenses supported by the evidence adduced at trial.

13

**CONCLUSION**

For the reasons above, defendants were properly convicted of two lesser included offenses — attempted extortion and misdemeanor false imprisonment — neither of which is included in the other.  Accordingly, the judgment of the Court of Appeal is reversed.


                                                                      LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
                         BAXTER, J.
                         WERDEGAR, J.
                         CHIN, J.
                         CORRIGAN, J.
                         BENKE, J.*

---

*         Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Eid

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 216 Cal.App.4th 740
**Rehearing Granted**

_____

**Opinion No.** S211702
**Date Filed:** July 10, 2014

_____

**Court:** Superior
**County:** Orange
**Judge:** M. Marc Kelly

_____

**Counsel:**

Richard J. Moller, under appointment by the Supreme Court, for Defendant and Appellant Reynaldo Junior Eid.

Siri Shetty, under appointment by the Supreme Court, for Defendant and Appellant Alaor Docarmo Oliveira, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Eric A. Swenson, Steven T. Oetting and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard J. Moller
P.O. Box 1669
Redway, CA  95560-1669
(707) 923-9199

Siri Shetty
Law Offices of Siri Shetty
PMB 421
415 Laurel Street
San Diego, CA  92101
(619) 810-7625

Elizabeth M. Carino
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2291