Filed 8/20/14  P. v. Washington CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B245418 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA057427) |
| v. | |
| RICHARD WASHINGTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed as modified.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Joseph P. Lee, and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Richard Washington was convicted by a jury of first degree felony murder with special circumstances, kidnapping to commit robbery, two counts of first degree burglary, robbery, assault with a deadly weapon, forcible rape, forcible sexual penetration and kidnapping for extortion.  On appeal Washington contends the trial court committed several errors including (1) denying his motion for mistrial after the prosecutor disclosed he had run criminal background checks on sworn jurors during the trial; (2) granting the People's pretrial motion to join sexual assault charges filed against Washington with the trial on the murder, robbery, aggravated kidnapping and aggravated assault charges; (3) admitting prejudicial evidence and excluding relevant evidence favorable to the defense; (4) failing to impose sanctions for the People's statutory discovery violations; (5) refusing his requests to instruct the jury on several lesser included offenses; and (6) permitting witnesses who had not performed forensic tests to testify to test results in violation of his Sixth Amendment right to confrontation.  He also contends his conviction for kidnapping to commit robbery is not supported by substantial evidence and his convictions for both rape and forcible sexual penetration arising out of the same act was improper.  We strike the forcible sexual penetration conviction and an improperly imposed parole revocation fine, order the correction of clerical errors relating to sentencing and, as modified, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1.  *The Initial Information*

An initial information filed September 22, 2006 charged Washington with five counts related to offenses committed against Dr. Jose Segundo in June 2005:  attempted murder (Pen. Code, §§ 664, 187, subd. (a)) (count 1),[1] kidnapping to commit robbery (§ 209, subd. (b)(1)) (count 2), first degree burglary (§ 459) (count 3), first degree residential robbery (§ 211) (count 4) and assault with a deadly weapon (§ 245, subd. (a)(1)) (count 5).  It was specially alleged as to each of those counts that

---

[1]    Statutory references are to the Penal Code unless otherwise indicated or context otherwise makes clear.

Washington had personally inflicted great bodily injury against a person 70 years of age or older (§ 12022.7, subds. (a), (c)). The information also charged Washington with two counts related to crimes against Marie Fouquet in May 2004: murder (§ 187, subd. (a)) (count 6) and first degree burglary (§ 459) (count 7). It was specially alleged as to count 6 that the murder was committed during the commission of a burglary (§ 190.2, subd. (a)(17)).

2. *The People's Motion for Joinder and the Filing of an Amended Information*

In February 2007 the People discovered a sperm sample taken from rape victim Betty K. in 2001 matched Washington's DNA profile. Pursuant to section 954, in July 2007 the People moved, over a defense objection, to join charges against Washington relating to the 2001 sexual assault of Betty K. with the trial on the 2004 and 2005 offenses charged in the initial information. Following a hearing, the court granted the motion for joinder on April 29, 2008, ordered the initial information amended to include charges of forcible rape (§ 261, subd. (a)(2)) (count 8) and forcible sexual penetration (§ 289, subd. (a)(1)) (count 9) and denied Washington's concomitant motion for severance. Pursuant to the court's order, an amended information was filed July 18, 2008 that included each of the counts and special allegations in the initial information filed September 22, 2006, as well as newly-added counts 8 and 9. The amended information also added special allegations that the sexual assault offenses in counts 8 and 9 were committed during the commission of a burglary (§ 667.61, subds. (a) & (d)).

3. *The Second Amended Information*

A second amended information (the operative charging document) filed January 12, 2011 included each of the nine counts and special allegations from the July 18, 2008 amended information and added a new charge of kidnapping Segundo for ransom/extortion (§ 209, subd. (a)) (count 10). It was specially alleged as to the newly-added count 10 that Washington had personally inflicted great bodily injury against a person 70 years of age or older (§ 12022.7, subds. (a), (c)). It was further alleged as to all counts that Washington had served four separate prison terms for felonies within the meaning of section 667.5, subdivision (b). The People did not seek the death penalty

3

with regard to the alleged special circumstances murder. Washington pleaded not guilty and denied all special allegations.

### 4. *The Evidence at Trial*

#### a. *The offenses against Segundo (counts 1 through 5, count 10)*

After he awoke from a nap in his backyard hammock on the afternoon of June 29, 2005, 82-year-old Segundo went inside his home and unexpectedly encountered Washington. Washington saw Segundo and struck him in the head and body multiple times with a large wooden board, continuing the assault even after Segundo had fallen to the floor. Washington then pushed Segundo into another room in the house, again knocked him to the floor, put his foot on Segundo's neck and face while pinning him to the ground and struck him several more times with the piece of wood. Washington demanded Segundo tell him where he stored his money. Segundo, on blood thinning medication and bleeding profusely from his wounds, told Washington he had money in another bedroom about 10 to 15 feet away. Washington pulled Segundo up and forced him to the bedroom where Segundo retrieved $200 to $300 in cash and immediately handed it to Washington. Washington then shoved Segundo into a nearby closet, ordered him to lie down, locked the closet door and placed a chair under the doorknob to prevent Segundo from escaping. Washington asked through the closet door where Segundo kept his ATM card and demanded Segundo give it to him along with the personal identification number (PIN) that would activate the card. Segundo slid the card under the closet door but gave Washington a false PIN. After Washington left, Segundo was able, with some effort, to unlatch the closet door and free himself. He noticed his cell phone had also been taken from his dresser. Segundo called the police emergency operator from a house telephone and reported the attack. He was immediately hospitalized. Segundo suffered a fracture to his hand and required numerous staples and sutures for his head wounds.

b. *The offenses against Fouquet* (*counts 6 and 7*)

On the afternoon of May 30, 2004 Raymond Fouquet arrived home to find his 78-year-old wife, Marie Fouquet, dead, her body sprawled awkwardly on the floor. Initially, both Raymond and paramedics believed she had suffered a heart attack. Soon, however, Raymond noticed jewelry and credit cards were missing from the bedroom. An investigation revealed Washington's fingerprints in the Fouquets' home; Raymond Fouquet's watch was found during a search of Washington's apartment; and video surveillance recordings from several banks and credit unions showed Washington attempting unsuccessfully to use an ATM card at the same time and at the same locations the Fouquets' ATM card had been used and declined for an invalid PIN. The deputy coroner who performed Marie Fouquet's autopsy, Dr. Stephen Scholtz, observed she had suffered bruising to the mouth and to the knuckles and concluded she had died from "mechanical asphyxia" resulting from chest compression and probable face compression. Dr. Scholtz testified mechanical asphyxia occurs when pressure from outside the body prevents respiration. Dr. Scholtz also found fractures to three of Marie Fouquet's ribs, consistent with an assailant having placed his foot on her chest. She also had defensive wounds. Jody Hynds, a forensic analyst at a private DNA testing laboratory, testified Marie Fouquet's fingernail clippings were examined for DNA. Test results showed that, although most of the DNA present was Marie Fouquet's, there was also a second, minor source of DNA underneath her nails, consistent with her defending herself from an attacker. The amount of DNA from a second source was too little to reach an affirmative conclusion, but Washington "could not be ruled out" as the minor contributor of the DNA.

c. *The offenses against Betty K.* (*counts 8 and 9*)

On the morning of April 26, 2001 63-year-old Betty K., whose right arm had been amputated several years earlier, was home alone when Washington approached an open backdoor and told Betty he was looking for his cat. After he cited the name of Betty's own cat, Betty became suspicious and demanded Washington leave. When she tried to close the door, Washington overpowered her, pushed the door in and threw her to the

5

floor. He hit Betty in the face, removed her pants and shirt, pushed part of a floor rug into her mouth to stop her from screaming, put his mouth on her breasts and inserted something in her vagina for about 90 seconds. Betty did not know if Washington had penetrated her with his finger or penis.[2] During the assault Betty pulled a chain from Washington's neck; he got up to retrieve it. Betty managed to escape at that point, running out the front door and screaming for her neighbor to call the police. DNA swabs taken from the exterior portion of Betty's vagina the day of the incident revealed sperm that, when tested, matched Washington's DNA. Tracey Ann Gomez, the forensic nurse who had examined Betty at the hospital within hours of the rape, testified semen can be pushed from the inside to the outside of the vagina by urination or by a prolapsed bladder, both of which had occurred in this case prior to Betty's same-day medical examination. Washington's fingerprint and handprint were also recovered from Betty's home.

d. *Washington's defense*

Washington did not testify or present any other witness testimony. His primary defense theory was that the People had failed to prove he was the perpetrator of any of the charged crimes.

5. *The Verdict and Sentence*

The jury acquitted Washington of the attempted murder of Segundo (count 1), found him guilty of all the other charged offenses and found true each of the special circumstances and specially alleged enhancements presented to it. In a bifurcated court

---

[2] Betty was asked, "Could you see what the man was doing? She responded, "No."
    "Q: What could you feel?
    "A: I felt something. I didn't know if it was his penis or his hands or what.
    "Q. And what did you feel his penis or his hand doing?
    "A: Inside my vagina.
    "Q: For approximately how long?
    "A: Ninety seconds."

trial on the prior prison term allegations, the court found Washington had served three separate prison sentences for felonies within the meaning of section 667.5, subdivision (b).

The court sentenced Washington to two consecutive terms of life without the possibility of parole (LWOP) for counts 6 (felony murder with special circumstances) and 10 (kidnapping for extortion resulting in bodily harm), plus five years for the section 12022.7, subdivision (c), enhancement for count 10 (the section 12022.7, subdivision (a), enhancement for the same count was stayed pursuant to section 654); and two 25-years-to-life terms under the one strike law (§ 667.61, subds. (a) & (d)) for counts 8 (forcible rape) and 9 (forcible sexual penetration by an unknown object) to run consecutively to each of the LWOP sentences but concurrently with each other; plus three years for the prior felony prison term enhancements (§ 667.5, subd. (b)).  Sentence on the remaining counts was imposed and stayed pursuant to section 654.

## DISCUSSION

1. *The Trial Court Did Not Err in Denying Washington's Mistrial Motion*

    a. *Relevant proceedings*

On the third day of trial the People moved to excuse juror number 12 on the ground she had deliberately concealed her prior arrest for possession and sale of rock cocaine when asked about arrests during voir dire.  The prosecutor explained he had discovered the falsehood after comparing the jurors' names with information in its Prosecution Information Management System, a prosecutorial database.[3]  Once juror number 12's name was found in the database, information regarding her criminal record

---

[3]    Both state and local law enforcement agencies maintain criminal record databases that are used by law enforcement and prosecutors in the course of their duties.  (See §§ 13100 ["The Legislature finds and declares . . . [¶] (a) [t]hat the criminal justice agencies in this state require, for the performance of their official duties, accurate and reasonably complete criminal record offender information"]; 13102 [listing the type of criminal offender record information compiled].)

7

(rap sheet)[4] was obtained, and the arrest discovered. The court immediately questioned juror number 12, who claimed she had forgotten about the arrest when responding during voir dire. The court found her explanation not credible, excused her from the jury and replaced her with an alternate juror.

Washington's counsel moved for a mistrial, arguing the prosecution's act of investigating without due cause the criminal records of jurors by using a database to which the defense lacked any access was unfair and deprived him of a fair trial and his jury trial right under the Sixth and Fourteenth Amendments.[5] The court denied the motion for mistrial, but ordered the prosecutor to provide the defense with the rap sheets and any other information his office had uncovered in its investigation so the prosecution and defense could be on "equal footing." Defense counsel requested the court direct the People to obtain the rap sheets of each sworn juror and alternate juror and provide that information to the defense. The court refused, stating, "Your request is noted and denied, because you are on equal footing. They don't have that information and now neither do you."

---

[4]     An individual's criminal offender record information—often called a rap sheet (see Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar (2014) § 12.5, pp. 286-288)—is considered a confidential record, accessible only to persons or entities, including prosecutors, specified by statute. (See §§ 11105, subd. (b), 13300, subd. (b)(3); see also 13300, subd. (b)(9) [state agency must furnish information to counsel for criminal defendant when authorized by statute or decisional law].)

[5]     Defense counsel stated: "For the District Attorney to be conducting criminal background investigations of the jurors when I don't have the same access to that information puts the defense in a very unequal position." While defense counsel objected to the removal of the juror, asserting she was credible, he argued the juror's credibility was irrelevant to his mistrial motion: "[The question] is whether or not the prosecution is using their resources that I don't have to gain an unlawful or unfair tactical advantage in the use of investigation to excuse jurors at any point in time."

b. *Standard of review*

A trial court should grant a mistrial "only when a party's chances of receiving a fair trial have been irreparably damaged . . . ." (*People v. Bolden* (2002) 29 Cal.4th 515, 555; accord, *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 291 ["we have stated that a trial court should grant a mistrial only if the defendant will suffer prejudice that is incurable by admonition or instruction"].) We review the trial court's ruling denying a mistrial for abuse of discretion. (*Bolden*, at p. 555; *People v. Ayala* (2000) 23 Cal.4th 225, 282.)

c. *Washington has not demonstrated a deprivation of his constitutional rights or incurable prejudice*

California courts have long condoned the prosecutorial practice of using the resources available to it—including access to criminal record databases not available to the defendant absent an authorizing statute or court order—to investigate potential jurors as an aid in jury selection. (*People v. Brawley* (1969) 1 Cal.3d 277, 293-294; *People v. Murtishaw* (1981) 29 Cal.3d 733, 765 (*Murtishaw*), overruled on another ground in *People v. Boyd* (1985) 38 Cal.3d 762, 772-773.) Historically, as long as the People represented to the court they had uncovered no information in their investigation that would justify excusing a potential juror for cause, the defense was not permitted access to any information the prosecution had compiled on the venire panel. (*Brawley,* at pp. 293-294.)

That practice was challenged in *Murtishaw,* when a defendant requested either discovery of the information the People had obtained on potential jurors through use of prosecutorial databases or, alternatively, sufficient funds to conduct its own investigation of the venire panel. Reviewing the trial court's order denying both requests, the Supreme Court recognized the People's access to databases containing information on potential jurors could leave a defendant, who lacks similar access, at a significant disadvantage during jury selection. "The danger posed by denial of discovery, however, is not merely that the prosecutor may conceal facts showing a juror is disqualified, but that he will obtain a significant advantage over the defense in exercising peremptory challenges."

9

(*Murtishaw, supra,* 29 Cal.3d at p. 766, fn. 27.)  The Court concluded fairness required vesting the trial court with discretion to order the prosecutor to disclose to the defense information on the jury venire he or she acquired from those databases:  "[I]t is apparent that the prosecutor here believes the advantage he gains from jury investigations and records justifies the expense.  When courts then deny defendants who cannot afford similar investigations access to the prosecutor's records, the result is that prosecutors in case after case will have substantially more information concerning prospective jurors than do defense counsel.  Such a pattern of inequality reflects on the fairness of the criminal process.  We therefore hold, under our authority to supervise the administration of California criminal procedure [citation] that following the finality of this opinion a trial judge will have discretionary authority to permit defense access to jury records and reports of investigations available to the prosecution."  (*Id.* at pp. 766-767, fn. omitted.)

As Washington acknowledges, under *Murtishaw* the People were permitted to obtain the rap sheets of potential jurors as part of their investigation of the jury venire.  However, he asserts *Murtishaw* did not address, and thus is not authority for, whether a prosecutor may wait until after the jury is sworn to investigate jurors without at least requesting leave of court and showing good cause for such an investigation.  According to Washington, the prosecutor's "sub-rosa investigation of seated jurors" constituted egregious misconduct that denied him his federal constitutional rights to a fair and impartial jury, equal protection and due process and violated Code of Civil Procedure sections 206 and 237.

At the threshold, Washington has not shown the prosecutor committed any misconduct.  (See *People v. Montes* (2014) 58 Cal.4th 809, 869 ["'[a] prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process'"]; *People v. Morales* (2001) 25 Cal.4th 34, 44 [same].)  While no reason in the record is given for the prosecutor's delay in investigating the jury panel, Washington has cited no relevant authority for the proposition that such an investigation, permissible before the jury has been sworn, somehow became impermissible once the jury was selected.

None of Washington's arguments for finding a constitutional deprivation in these circumstances is persuasive. His contention he was deprived of his Sixth and Fourteenth Amendment right to a fair and impartial jury is premised not on the court's replacement of juror number 12 after finding she had lied during voir dire—an entirely proper ruling (see *People v. Wilson* (2008) 44 Cal.4th 758, 820-821)[6]—but on his speculation the composition of the jury might have been different had he been apprised during voir dire of the results of the prosecutor's investigation. To the extent Washington suggests the delay in the investigation deprived him of the ability to exercise his peremptory challenges differently, the Supreme Court has made clear that alone does not constitute constitutional error. (See *People v. Black* (2014) 58 Cal.4th 912, 916-917 ["'[P]eremptory challenges are not of constitutional dimension,' but are merely 'a means to achieve the end of an impartial jury.' [Citation.] Mere loss of a peremptory challenge does not automatically constitute a violation of the federal constitutional right to a fair and impartial jury. [Citation.] If no biased or legally incompetent juror has served on defendant's jury, the judgment against him does not suffer from a federal constitutional infirmity, even if he had to exercise one or more peremptory challenges to excuse prospective jurors whom the court should have excused for cause"]; *People v. Farley* (2009) 46 Cal.4th 1053, 1096 ["'"[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean"'" a constitutional violation occurred].)

Washington's due process and equal protection arguments are similarly infirm. He contends it was simply unfair to permit the prosecutor to conduct an investigation using databases to which he lacked access. However, no court, including *Murtishaw,* has recognized a federal constitutional right to access to prosecutorial databases to obtain information on the jury venire; and the Supreme Court has made clear that denial of access alone, even when an abuse of discretion, will rarely compel reversal. (See

---

6     Washington expressly states he is not challenging the replacement of juror number 12.

*Murtishaw, supra,* 29 Cal.3d at p. 767 ["The foregoing holding does not require us to reverse the conviction in the present case. . . . [I]n any individual case it is entirely speculative whether denial of access caused any significant harm to the defense. Consequently, under the test of prejudice established in the California Constitution (art. VI, § 13) and *People v. Watson* [(1956)] 46 Cal.2d 818, 836, the denial of access is not reversible error."]; accord, *People v. Pride* (1992) 3 Cal.4th 195, 227.) More critically, this case does not involve denial of access. The trial court ensured Washington was given all the information the prosecutor had gathered on the jurors. There was no disparate treatment and no prejudice.

Washington also contends the prosecutor's investigation of jurors whose identities were sealed at the time they were sworn[7] violated Code of Civil Procedure sections 206 and 237. Washington has forfeited this argument, which he did not make in the trial court. (*People v. Valdez* (2012) 55 Cal.4th 82, 142; *People v. Lucas* (1995) 12 Cal.4th 415, 477.) His contention lacks merit in any event, as neither statute is on point. Code of Civil Procedure section 206 addresses the circumstances under which a prosecutor or defense counsel may discuss a verdict and deliberations with jurors after they have been discharged. Code of Civil Procedure section 237 governs the court's powers to seal and unseal juror identification information and specifies the procedure for obtaining that information after a verdict has been recorded, including notifying the former juror of the request and giving the former juror the opportunity to object. Nothing in either statute addresses, much less proscribes, the prosecutor's internal and confidential investigation of seated jurors during trial using prosecutorial databases so long as it is accomplished in a manner that is not likely to influence the juror. (Cf. Rules Prof. Conduct, rule 5-320(E) ["[a] member shall not directly or indirectly conduct an out of court investigation of a

---

[7]     Washington's assertion the jurors' names were sealed at the time of the prosecutor's investigation of juror number 12 appears incorrect. Prior to trial the court ordered the jurors' questionnaires sealed. The record indicates the court ordered all juror identification information sealed pursuant to Code of Civil Procedure section 237, subdivision (a)(2), after the trial concluded.

12

person who is either a member of the venire or a juror in a manner likely to influence the state of mind of such person in connection with present or future jury service"].)

Washington also advances several policy arguments for prohibiting the prosecutor from engaging in an investigation of jurors once they are sworn. For example, he asserts this practice will have a chilling effect on potential jurors' willingness to serve. The People respond the only effect it will have is to encourage jurors to be honest during voir dire. The limited record before us does not permit an in-depth evaluation of these arguments, much less commentary on the wisdom of the prosecutorial practice. We hold simply that any potential for prejudice in this case caused by the prosecutor's decision to obtain rap sheets of sworn jurors identified in its prosecutorial database was promptly and properly remedied when the court ordered the People to turn over to the defense the materials it had obtained in its investigation: The court created the level playing field envisioned in *Murtishaw*. There was no constitutional error and certainly no incurable prejudice. Washington's motion for mistrial was properly denied.[8]

### 2. *The Court Did Not Err in Ordering Joinder of the Sexual Assault Charges with the Trial on the Murder, Attempted Murder and Aggravated Assault Charges*

Section 954 permits two or more offenses of the same class or connected together in their commission to be consolidated for trial against a single defendant. "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).)[9] When the statutory requirements for joinder have been met, the defendant can demonstrate error in the denial of a motion to sever only by a clear

---

[8]    Washington's challenge to the court's denial of his new trial motion, predicated on the same grounds, also fails for the reasons we have discussed.

[9]    The efficiency and benefits of a joint trial were described in *People v. Bean* (1988) 46 Cal.3d 919, 939-940: "A unitary trial requires a single courtroom, judge, and court attachés. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process." (Accord, *People v. Soper* (2009) 45 Cal.4th 759, 772.)

13

showing of potential prejudice.  (*Ibid*.; *People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).)  A trial court's consolidation order or denial of severance amounts to a prejudicial abuse of discretion if its ruling falls outside the bounds of reason.  (*Alcala,* at p. 1220, *Soper,* at p. 774.)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, "'we consider the record before the trial court when it made its ruling.'"  (*Soper, supra,* 45 Cal.4th at p. 774.)  "First, we consider the cross-admissibility of the evidence in hypothetical separate trials.  [Citation.]  If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.  [Citation.]  Moreover, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges."  (*Id.* at pp. 774-775; accord, *Alcala*, *supra*, 43 Cal.4th at p. 1220.)

If the "evidence underlying properly joined charges would not be cross-admissible, we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]  In making *that* assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility— might establish an abuse of the trial court's discretion:  (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case.  [Citations.]  We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state."  (*Soper*, *supra*, 45 Cal.4th at p. 775; see *Alcala*, *supra*, 43 Cal.4th at pp. 1220-1222.)

Washington does not challenge the trial court's ruling the sexual assault charges were in the same class of offenses as the murder, robbery and aggravated assault charges. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 188 [rape offense was properly joined with assault and murder offenses under section 954; "rape is an assaultive crime against the person, as are robbery and murder"].) Rather, he argues the court erred in permitting joinder because none of the evidence would have been cross-admissible had the charges been filed separately. (See *People v. Johnson* (1988) 47 Cal.3d 576, 589 [in terms of a severance motion cross-admissibility requires that "'evidence pertinent to one case [would] have been admissible in the other under the rules of evidence which limit the use of character evidence or prior similar acts to provide conduct. (Evid. Code, § 1101, subds. (a), and (b)'"]; *Soper, supra,* 45 Cal.4th at pp. 776-777.) The People assert cross-admissibility was likely under section 1101, subdivision (b), to show a "common scheme or plan" or modus operandi to prey on vulnerable victims—the elderly and disabled— during the day in their own homes. The trial court expressed some uncertainty about whether the sexual assault crimes were cross-admissible with the other charged offenses but ultimately determined joinder was proper whether or not they were cross-admissible.

We agree with the trial court's conclusion the issue of cross-admissibility is not determinative here. Even if the two offenses were not sufficiently similar under Evidence Code section 1101, subdivision (b), to be cross-admissible, the other factors, as the trial court recognized, weighed overwhelmingly in favor of joinder: The sexual assault offenses were no more inflammatory than the murder, attempted murder, robbery and aggravated assault charges filed against Washington and tried together. (See *People v. Alvarez, supra,* 14 Cal.4th at p. 188; *People v. Scott* (2011) 52 Cal.4th 452, 469-473 [trial court did not abuse its discretion in denying severance of burglary and rape charges from murder charge; burglary and rape charges no more inflammatory than murder of different victim].) Moreover, this was not a situation in which a strong case was paired with a weak one. The evidence against Washington for his sexual assaults was strong. Washington's DNA was recovered from Betty's body; his fingerprints were found in her home. Likewise, as to the Fouquet burglary and murder, Washington's fingerprints were

15

found in the Fouquets' home, Raymond Fouquet's wristwatch was found in Washington's apartment, and he was captured on surveillance video attempting to use the Fouquets' ATM card. The trial court did not abuse its discretion in concluding at the outset of trial that Washington had failed to meet his burden of proving consolidation of the sexual assault offenses with the other charged crimes created a potential for prejudice.

Washington also contends, even if joinder was proper when considered before trial, consolidation ultimately denied him a fair trial. (See *Soper, supra,* 45 Cal.4th at p. 783 [even if a trial court's denial of severance was correct when made, a reviewing court must reverse the judgment if the defendant shows joinder actually resulted in gross unfairness amounting to a denial of due process]; *Williams v. Superior Court* (1984) 36 Cal.3d 441, 448 ["the joinder laws must never be used to deny a criminal defendant's fundamental right to due process and a fair trial"]; *People v. Smallwood* (1986) 42 Cal.3d 415, 448 [same].) In considering whether joinder, even if proper at the time, nonetheless deprived a defendant of due process, the reviewing court examines all the evidence actually introduced as well as any spillover effect of the evidence from the joint charges. (See *People v. Macklem* (2007) 149 Cal.App.4th 674, 698.) The defendant bears the burden of demonstrating prejudice. (*People v. Sandoval* (1992) 4 Cal.4th 155, 174.)

Washington asserts the prejudice from joinder was evident when the prosecutor referred in closing argument to Washington's propensity to attack vulnerable people in their homes. The statement was a fair comment on the admissible evidence and, contrary to Washington's contention, was not itself misconduct. Moreover, the same observation about Washington could have been made absent joinder of the sexual assault offenses. More significantly, the trial court instructed the jury "to consider each count separately and return a separate verdict for each one." The court also instructed, "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt." The jury demonstrated it was mindful of that admonishment, acquitting Washington of the charge of attempted murder. Nothing in

16

this record supports Washington's contention the order of joinder ultimately resulted in a denial of due process.

     3. *The Trial Court's Evidentiary Rulings Do Not Compel Reversal*

       a. *Evidence Washington's nickname is Bam-Bam*

During his investigation of the crimes against Segundo, Los Angeles Police Detective Warren Porche determined someone had used Segundo's stolen cell phone to call Shayla Wrought and Taneya Hanson. Without objection, Wrought identified one of the numbers called as hers and testified Washington was also known as Bam-Bam. Detective Porsche later testified Hanson had told him she had received a call from "Richie"; she did not know Richie's last name but he was sometimes referred to as Bam-Bam. Washington objected pursuant to Evidence Code section 352 on the ground his nickname would be recognized as a gang moniker and thus highly prejudicial. While acknowledging the nickname may be familiar to some jurors as the name of a character from The Flintstones cartoon, the trial court concluded there was nothing intrinsic in the name or the prosecutor's use of it that suggested membership in a criminal street gang.[10]

Washington contends the nickname, even if relevant to prove the identity of the caller, was far more prejudicial than probative because it essentially labeled him as a member of a criminal street gang. Assuming Washington's late objection was sufficient to adequately preserve the issue for appeal, his contention lacks merit. Segundo was unable to identify his attacker. The identity of the caller using Segundo's cell phone was highly probative evidence. The trial court's careful weighing of the evidence and its determination the nickname was not intrinsically suggestive of membership in a criminal street gang was well within its discretion. (See *People v. Williams* (2008) 43 Cal.4th 584, 634 [trial court has broad discretion under Evid. Code, § 352, and its ruling will not be

---

[10] The prosecutor invoked the cartoon reference during closing argument, suggesting it was not surprising a person named Bam-Bam would use a wooden board to beat someone. Washington's objection to the nickname at trial was limited to the purported gang connotations inherent in the name; he did not argue below, and does not contend on appeal, the nickname was prejudicial because its namesake cartoon character was known for beating things with a wooden club.

17

disturbed absent evidence it was arbitrary or capricious]; *People v. Mills* (2010) 48 Cal.4th 158, 195 [same]; *People v. Brown* (2003) 31 Cal.4th 518, 551 & fn. 12 [trial court did not abuse its discretion in admitting evidence defendant was also known as Bam-Bam; "the court carefully weighed defendant's concern over the potentially prejudicial effect of the nickname with the prosecutor's assertion that many of the witnesses knew defendant only by that name"].)

> b. *Admission of Washington's booking photograph from an arrest in 2000*

During trial Betty described her attacker as a young Black male, medium build, standing approximately five feet, seven or eight inches tall with a diamond stud in his left ear. She did not identify Washington specifically, stating only there were a lot of similarities between him and the assailant. She also testified Washington appeared heavier than the person who had attacked her 11 years earlier. Following Betty's testimony, the People sought to introduce a booking photograph taken of Washington in October 2000, six months before Betty was sexually assaulted. The photograph showed Washington with a crystal or diamond stud earring in his left ear. It also contained information at the bottom of the photograph listing Washington's height as five feet nine inches and his weight. The offense for which he was arrested had been redacted. Washington objected on several grounds, including that the photograph was more prejudicial than probative and should be excluded under Evidence Code section 352.[11] During an Evidence Code section 402 hearing, the court overruled Washington's section 352 objection, stating, "I understand [the objection]. But in terms of any prejudicial value, the fact that this is identified as a booking photo, I think it's going to be outweighed by the probative nature of the photograph." Later in the section 402

---

[11]     Washington also argued the information contained in the photograph was hearsay and violated his right to confrontation. The People made an offer of proof the information at the bottom of the photograph was recorded at the time of booking by the booking officer and qualified as an official record. The court ruled the information in the photograph was hearsay—it was being offered for the truth of the matter asserted—but was admissible as an official record. (Evid. Code, § 1280.) The court also overruled Washington's confrontation clause objection.

18

proceeding, the court offered to sanitize the evidence by omitting any reference to it as a booking photograph: "I'm going to allow the photograph. They can identify it as a booking photograph. If you don't want it identified as a booking photograph, then we'll just indicate it's a photograph taken on October 25, 2000." Defense counsel rejected the offer, telling the court, "I've been taught I just have to object [to admissibility] and let the court make its own ruling. I can't agree to anything or waive the objection under confrontation."

Washington contends the photograph, coupled with Detective Cedeno's testimony authenticating it as a booking record, effectively informed the jury he had been arrested for a prior, albeit unidentified, crime and thus was highly prejudicial and should have been excluded under Evidence Code section 352. The court carefully considered his objection but found the photograph highly probative: The photograph reflected Washington's altered physical appearance in the 11 years since the attack; and it tended to support Betty's description of him at the time of the attack, as well as to explain her difficulty in identifying him more definitely at the time of trial. While there may have been alternative ways to further sanitize the evidence,[12] the trial court's ruling that, on balance, the probative value of the evidence was not substantially outweighed by its prejudicial effect was well within its discretion.

---

[12] Washington's trial counsel, apparently under the mistaken belief he would forfeit his objections if he acceded to the court's suggestion for sanitizing the evidence, refused the court's offer. A party confronted with an adverse ruling on admissibility does not forfeit his or her stated objections by attempting to mitigate the damage that would result from the adverse evidentiary ruling. (*People v. Calio* (1986) 42 Cal.3d 639, 643 ["'[a]n attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation'"] see *State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1129 ["the law is clear that '[p]arties do *not* waive error by "acquiescence" when they object to trial court error and then take "defensive" action to lessen the impact'"].)

19

c. *The trial court's exclusion of cumulative third party culpability evidence*

During trial the jury heard evidence that, when first presented with a photographic array of six pictures that did not include Washington's, Betty circled the photograph of Jeremiah Woods and wrote below it that he "looks the most like I remembered, that of the person who attacked me." Asked to explain what she meant, Betty testified Woods had the "most characteristics" of her rapist, more than any other of the photographs presented to her in that array. Evidence was also presented that Woods's DNA was tested and he was excluded as a suspect because his DNA did not match the DNA from the sperm taken from Betty's vagina the day of the rape.

After the People rested, defense counsel told the trial court he wanted to call Benita Sanders as a witness. Asked for an offer of proof, defense counsel explained Sanders, a neighbor of Betty, had viewed the same photographic array as Betty in 2001 and, like Betty, had circled Woods as the person who "look[ed] like" the man she had seen running from the side of her house the day Betty was attacked. Sanders told police, however, that Woods had less hair than the man she saw. The People objected under Evidence Code section 352; and the court sustained the objection and excluded the evidence, stating, "I think the probative value is not sufficient to outweigh the prejudicial value and the confusion of issues in light of the evidence that was presented."

A criminal defendant has the right to present evidence of third party culpability if the evidence is capable of raising a reasonable doubt about the defendant's guilt. (*People v. Brady* (2010) 50 Cal.4th 547, 558; *People v. Avila* (2006) 38 Cal.4th 491, 577-578.) To be relevant, such evidence must link the third person "either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt" and, if so, whether it should nonetheless be excluded as unduly prejudicial or confusing under Evidence Code section 352. (*People v. McWhorter* (2009) 47 Cal.4th 318, 367-368; *Brady,* at p. 558.)

The trial court did not abuse its discretion in excluding the proffered testimony under Evidence Code section 352. The probative value of Sanders's proposed testimony

20

was marginal. Sanders's purported identification of Woods in the photographic array, like Betty's, was less than definitive. The jury also heard testimony, without objection, that Woods had been excluded as a suspect based on DNA testing. There was no error; and even if there were, on this evidentiary record is it is not reasonably probable Washington would have received a more favorable verdict had Sanders's testimony been admitted. (See *People v. Page* (2008) 44 Cal.4th 1, 42 [even if the court abused its discretion, reversal is not warranted unless "'it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error'"].)[13]

4. *Washington Cannot Be Convicted for Both Rape and Sexual Penetration by an Unknown Object Based on a Single Act of Intercourse/Penetration*

Insisting a single penetration formed the basis for both the charge of rape (count 8) and sexual penetration by a foreign or unknown object (count 9), Washington contends he cannot be convicted of both offenses or, at minimum, cannot be punished for both under section 654. Although it is generally permissible to convict a defendant of multiple charges arising from a single act or course of conduct (see *People v. Ortega* (1998) 19 Cal.4th 686, 692), under the circumstances presented here the rape and sexual penetration with an unknown object charges should have been presented to the jury in the alternative.

Section 289, subdivision (a), makes it a felony to commit an act of sexual penetration by means of force or fear; section 289, subdivision (k)(1), defines "sexual penetration" as "the act of causing the penetration, however slight, of the genital or anal

---

[13] Washington's contention the court's ruling deprived him of his constitutional right to present a defense fails. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1243 ["'[W]e . . . reject defendant's various claims that the trial court's exclusion of the proffered [third party culpability] evidence [under Evid. Code, §§ 350, 352] violated his federal constitutional rights to present a defense . . . . There was no error under state law, and we have long observed that "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense"'"]; *People v. Hall* (1986) 41 Cal.3d 826, 834 [same]; see also *Holmes v. South Carolina* (2006) 547 U.S. 319, 327 [126 S.Ct. 1727, 164 L.Ed.2d 503] [the federal Constitution permits judges "'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues"'"].)

opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse, by any foreign object . . . . or by any unknown object"; section 289, subdivision (k)(3), defines "unknown object" as including "any foreign object, substance, instrument, or device, or any part of the body, including a penis, when it is not known whether penetration was by a penis or by a foreign object, substance, instrument, or device, or by any other part of the body." The jury was instructed with CALCRIM No. 1045 that penetration by an unknown object occurs "if it is not known what object penetrated the opening."

As discussed, Betty testified she felt something insider her vagina for approximately 90 seconds but did not know if it was her assailant's penis or finger. Because the jury found Betty had been raped, it necessarily agreed Washington had accomplished this penetration with his penis—a conclusion firmly grounded in the evidence, including the presence of Washington's sperm on the outside of her vagina. (See §§ 261, subd. (a) ["[r]ape is an act of sexual intercourse accomplished . . . [¶] . . . [¶] (2) . . . against a person's will by means of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the person of another"]; 263 ["[a]ny sexual penetration, however slight is sufficient to complete the crime [of rape]"].)[14] A finding Betty was penetrated with a known object (Washington's penis), however, precludes the requisite finding under section 289, subdivision (k)(3), that the object be unknown.

The Attorney General contends Washington was properly convicted of two separate offenses based on two separate acts notwithstanding Betty's testimony at trial, which identified only a act of single penetration, because the forensic nurse who had examined Betty soon after the attack testified Betty "reported to me that she definitely was penetrated with a finger, but she was not sure about vaginal-penile penetration." The

---

[14]    The jury was instructed, pursuant to CALCRIM No. 1000, to prove Washington was guilty of rape, the People must prove, in part, "The defendant had sexual intercourse with a woman" and was told, "Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."

22

Attorney General argues this testimony constitutes substantial evidence supporting a jury finding that Betty had been both raped and sexually penetrated with a foreign object.

Immediately before the quoted testimony, however, the nurse practitioner had said Betty "described what she thought was penetration of her vagina, but was not sure what the object was"—plainly indicating only a single act of penetration, as Betty testified. Moreover, the prosecutor's theory at trial was that Betty had been subjected to a single act of penetration, not two. In his opening statement the prosecutor said, "Betty K. will tell you the defendant then inserted something in her vagina, she doesn't know what." In closing argument, with respect to the rape count, the prosecutor argued the evidence established that Washington had sexual intercourse with Betty: "We know that took place. Betty K. came in and told us something was placed in her vagina. She thought it was either a finger or a penis. But we know it was the penis because they found sperm just outside of her vagina." Then, with respect to the sexual penetration count, the prosecutor argued, "We know [penetration has] been shown beyond a reasonable doubt because Betty K. tells us something was put insider her vagina. The penetration was accomplished by using an unknown object; finger, penis, or any other object. It doesn't matter what it is. It could have been a finger. It could have been a penis. It doesn't matter. But we know at some point it's a penis . . . . They find sperm outsider her vagina. So we know it's not the finger. We know it's not his finger. There's no way his finger left sperm outside of her vagina."[15] Finally, in their sentencing memorandum the People recommended sentence on either count 8 or count 9 be stayed pursuant to section 654—a recommendation the trial court rejected without explanation.

_____

[15] In her respondent's brief the Attorney General paraphrases this portion of the closing argument in the following manner: "The prosecutor told the jury that the record established that appellant had penetrated Betty's vagina with his penis, but for the purposes of count IX, 'it could have been a finger,' in addition to the penile-vaginal penetration required for count VIII." That was not the argument the prosecutor made: As quoted in text, when discussing count 9 the prosecutor expressly told the jury the evidence demonstrated it was Washington's penis, "not his finger," that had penetrated Betty.

In sum, because the jury found on substantial evidence that Betty had been raped, it could not find the same penetration was by an unknown object. Washington's conviction of sexual penetration with an unknown object (count 9) must be stricken.

     5. *The Trial Court Properly Addressed Any Discovery Violations*

         a. *Relevant proceedings*

Dr. Stephen Scholtz, the deputy medical examiner who performed Fouquet's autopsy, opined at trial that Fouquet had died of mechanical asphyxia, impairment of respiration by mechanical means such as the covering of air passages. He testified Fouquet had handprints on her face and fractured ribs consistent with someone placing a knee or foot on top of her rib cage. He also testified during cross-examination that Fouquet had suffered "chest trauma, probable asphyxia."

After defense counsel had completed his cross-examination of Dr. Scholtz, the People requested, and the court permitted, Dr. Lakshmanan Sathyavagiswaran, Chief Medical Examiner and Coroner of Los Angeles County and Dr. Scholtz's supervisor, to testify out of order to accommodate Dr. Sathyavagiswaran's travel schedule. Dr. Sathyavagiswaran testified he "concur[red] with Dr. Scholtz's opinion of mechanical asphyxia as the cause of death because the chest compression is a fact." Defense counsel objected, insisting Dr. Sathyavagiswaran's opinion was "new and undisclosed evidence"; Dr. Scholtz had testified to a "completely different" cause of death; and Dr. Sathyavagiswaran's opinion was the product of a courthouse conversation between the prosecutor and the physician that had occurred just prior to his testimony and had not been disclosed to the defense in violation of section 1054.3's discovery requirements. The court expressed some disagreement with defense counsel's characterization of Dr. Sathyavagiswaran's opinion as new and different from Dr. Scholtz's testimony, but ordered the prosecutor to produce any notes or reduce the notes to a summary of the courthouse conversation and provide it to the defense. It also told defense counsel it would permit him to cross-examine Dr. Sathyavagiswaran and even recall him if necessary after counsel reviewed the report of the conversation. Dr. Sathyavagiswaran testified Fouquet's death certificate, prepared by Dr. Scholtz, provided that the cause of

24

death was mechanical asphyxia caused by chest compression and probable facial compression, and he agreed with Dr. Scholtz's conclusions.

After Dr. Scholtz's examination resumed, Dr. Scholtz indicated he had brought with him additional photographs of Fouquet's body taken during the autopsy. (Several other autopsy photographs had been produced in discovery and discussed earlier in Dr. Scholtz's testimony.) Washington objected to the introduction of this new evidence. The People represented they had just been given the photographs that morning by Dr. Scholtz and immediately turned them over to the defense. Outside the presence of the jury, the court reviewed each photograph to determine its admissibility. The court excluded some as duplicative and permitted others because they highlighted the handprint on Fouquet's face a little more clearly than the other photographs. The court denied Washington's request to exclude at least one of the photographs as a discovery sanction for their late production. The court explained, "I'm not going to exclude it. First of all, I don't think it's appropriate, because I don't think that photo is really marginally different from photos that were in fact turned over, or significantly different. I think it is really just another photo of things that are depicted in items that were turned over. And that's why, while it may have been a technical violation of 1054.1, I don't think it warrants a sanction."

b. *The trial court's actions cured any prejudice caused by a violation of the criminal discovery statutes*

Section 1054.1 requires the prosecution to disclose to the defense certain categories of evidence in its possession, including "any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses  whom the prosecutor intends to call at the trial . . . ." (See *People v. Verdugo* (2010) 50 Cal.4th 263, 279-280; *In re Littlefield* (1993) 5 Cal.4th 122, 135.) Absent good cause, "such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial." (*Verdugo,* at p. 280; see § 1054.7 ["[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately unless good cause is shown"].) If any party fails to

25

comply with the statutory disclosure requirements, the trial court "may make any order necessary" to enforce those provisions, "including, but not limited to, [ordering] immediate disclosure, [initiating] contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continu[ing] . . . the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5; accord, *Verdugo,* at p. 280.) The trial court's determination whether a discovery violation occurred is reviewed for abuse of discretion. (*People v. Ayala*, *supra*, 23 Cal.4th at p. 299.)

Citing *Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 160, Washington contends the prosecution team violated the reciprocal discovery statutes when they interviewed Dr. Sathyavagiswaran during the lunchtime recess without disclosing the content of that interview to the defense. (See *ibid.* [§ 1054.3's requirement that defense counsel disclose to prosecutor all relevant statements made by persons other than the defendant who defense counsel intends to call as a witness includes unrecorded oral statements made by a third party investigator]; Levenson, Cal. Criminal Procedure (The Rutter Group 2014) § 16:3 [*Roland*'s recognition of a duty by defense under § 1054.3 to provide the content of any unrecorded oral statements made by a witness likely signals "a reciprocal duty by the prosecution" to provide same under § 1054.1, subd. (f)].) The People insist there was no violation of the discovery statutes, and certainly no prejudice, because the lunchtime conversation did not yield new evidence not otherwise disclosed. We need not wade into the parties' debate on the character of the information purportedly obtained during that conversation. The trial court, in an abundance of caution, cured any prejudice when, in accordance with its discretion under section 1054.5, it ordered the People to produce a report and any notes from the conversation with Dr. Sathyavagiswaran and permitted the defense to fully examine him on it at trial. Washington's appellate briefs fall woefully short of demonstrating how that order was insufficient to cure the harm he identifies. (See *People v. Wimberly* (1992) 5 Cal.App.4th 773, 792-793 [remedy for a discovery violation should be no broader than necessary to guarantee a fair trial].)

Washington's related contention the additional autopsy photographs should have been excluded as a sanction for violating the discovery statutes similarly fails. The trial court addressed Washington's challenge to the new autopsy photographs by questioning Dr. Scholtz and the prosecutor and reviewing each photograph outside the presence of the jury before determining they were only marginally different from the ones otherwise produced and admitted into evidence at trial. Washington has failed to demonstrate the court abused its discretion in refusing to exclude any of the additional photographs as a discovery sanction, much less show the admission of this largely cumulative evidence, even if error, was prejudicial or otherwise deprived him of a fair trial.

Finally, Washington contends the court should have, at minimum, given a delayed discovery instruction regarding both purported discovery violations. (See § 1054.5 [vesting court with discretion to inform jury of any untimely disclosure of evidence]; CALCRIM No. 306 [advising jury it may consider the effect, if any, of party's late disclosure of evidence].) As explained, even if there were a technical violation of the discovery statutes, the trial court amply and timely cured any prejudice. Under those circumstances, the court's determination an instruction was not warranted and would only serve to confuse the jury was well within its discretion. (See *People v. Curl* (2009) 46 Cal.4th 339, 357 [court has broad discretion to determine whether late-discovery instruction is warranted]; *People v. Ayala, supra,* 23 Cal.4th at p. 299 [same].)

6. *The Trial Court Did Not Commit Instructional Error*

a. *Jury instructions containing caption headings*

Washington contends the court committed prejudicial error when it refused his request to delete CALCRIM instruction titles from the written instructions given to the jury. In particular, he argues CALCRIM Nos. 3178 and 3180, which included captions indicating they pertained to "sentencing factors,"[16] improperly invited the jury to

---

16      CALCRIM No. 3178, captioned, "Sex Offenses: Sentencing Factors—Burglary with Intent To Commit Sex Offense (Pen. Code, § 667.61(d)(4)" instructed the jury that, if it found Washington guilty of the sexual assault crimes charged in counts 8 and 9, it must then decide "whether the People have proved the additional allegation that the

27

consider punishment by suggesting a true finding on the question would increase his sentence. (*People v. Jackson* (1986) 177 Cal.App.3d 708, 714 ["jury is not permitted to consider punishment or penalty in determining guilt or innocence"].) We agree it is better practice not to provide at least certain caption headings to the jury: The CALCRIM captions are not part of instructions and are properly removed before presentation of the written instructions to the jury (see *People v. Torres* (2011) 198 Cal.App.4th 1131, 1147, fn. 11). Nevertheless, the suggestion the captions Washington has identified invited improper consideration of punishment is far too speculative to be a ground for reversal. (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [112 S.Ct. 475, 116 L.Ed.2d 385] [in reviewing claim court's instructions were incorrect or misleading, a reviewing court inquires whether there is a reasonable likelihood the jury misunderstood the instruction or misapplied the law]; *People v. Cross* (2008) 45 Cal.4th 58, 67-68 [same].) Any ambiguity in this regard was clarified when the court instructed the jury with CALCRIM No. 706, captioned, "Special Circumstances: Jury May Not Consider Punishment," specifically informing the jury it "may not consider or discuss penalty or punishment in any way when deciding whether a special circumstance, or any other charge, has been proved." The trial court also instructed the jury with CALCRIM No. 3550, which similarly admonished, "You must reach your verdict without any consideration of punishment." We presume the jury followed these very clear and specific instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139; *People v. Holt*

---

defendant committed the crime during the commission of burglary, with the intent to commit Forcible Rape and Sexual Penetration by Force. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. . . ."

CALCRIM No. 3180, captioned, "Sex Offenses: Sentencing Factors—Burglary (Pen. Code, § 667.61(e)(2))" similarly instructed, if it found Washington guilty of the crimes charged in count 8 or 9, the jury must then decide "whether, for each crime, the People have proved the additional allegation that the defendant committed the crime during the commission of a burglary. . . ."

28

(1997) 15 Cal.4th 619, 662 ["[j]urors are presumed to understand and follow the court's instructions"].)

### b. *Lesser included offense instructions*

The trial court must instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) That obligation includes giving instructions on lesser included offenses, whether or not they are requested, when there is substantial evidence from which a reasonable juror could find the lesser, but not the greater offense, was committed. (*People v. Eid* (July 10, 2014, S211702) 59 Cal.4th 650; *People v. Taylor* (2010) 48 Cal.4th 574, 624; *People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1138.)[17]

In deciding whether there is substantial evidence to support a lesser included offense instruction, the "court determines only its bare legal sufficiency, not its weight." (*People v. Moye* (2008) 47 Cal.4th 537, 556.) On appeal we review independently whether a lesser included offense instruction was warranted. (*People v. Avila* (2009) 46 Cal.4th 680, 705.)

### i. *The trial court's refusal to give a second degree murder instruction could not have been prejudicial*

Washington contends the court erred in denying his request to instruct on second degree murder as a lesser included offense of the murder charged in count 6 (murder of Fouquet). Although the People proceeded solely on a first degree felony murder theory, he asserts the information charged him with murder without specifying the theory; second

---

[17] The reason for requiring a lesser included offense instruction when the evidence warrants it is well known: "A jury instructed on only the charged offense might be tempted to convict the defendant '"of a greater offense than that established by the evidence"' rather than acquit the defendant altogether, or it may be forced to acquit the defendant because the charged crime is not proven even though the "evidence is sufficient to establish a lesser included offense.'" [Citation.] Instructing the jury on lesser included offenses avoids presenting the jury with 'an "unwarranted all-or-nothing choice.""' (*People v. Eid, supra,* 59 Cal.4th at p. 657; accord, *People v. Breverman, supra,* 19 Cal.4th at p. 155.)

degree murder is a lesser included offense of first degree murder; and there was substantial evidence from which a jury could have found Washington engaged in conduct (stepping on Fouquet blocking her air passages) that, although not intended to kill, evidenced a reckless disregard for human life, a finding consistent with second degree (malice) murder. (See *People v. Taylor, supra,* 48 Cal.4th at pp. 623-624 [second degree murder is the unlawful killing of a human being with malice; malice will be implied "'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'"]; *People v. Knoller* (2007) 41 Cal.4th 139, 152 [same].)

The Supreme Court "ha[s] yet to decide whether second degree murder is a lesser included offense of first degree murder where, as here, the prosecution proceeds only on a theory of first degree felony murder," a theory of murder that does not require malice. (*People v. Taylor, supra,* 48 Cal.4th at p. 623; *People v. Romero* (2008) 44 Cal.4th 386, 402 [same].) We need not address that question here or consider whether there was evidence from which a reasonable juror could have concluded Washington did not intend to kill Fouquet. The jury convicted Washington of first degree residential burglary and found true the special circumstance that the murder of Fouquet was committed during the course of a burglary. When, as here, "'the elements of felony murder and the special circumstance[s] coincide, the true finding[s] as to the . . . special circumstance[s] establish[] . . . that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder.'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1328.) Under these circumstances, "any error in not instructing the jury concerning second degree murder was harmless beyond a reasonable doubt." (*Ibid.;* accord, *People v. Campbell* (July 1, 2014, E055528) 227 Cal.App.4th 746, __.)[18]

---

[18] Washington's contention he was also entitled to an instruction on second degree felony murder is without merit and evidences a misapprehension of the felony murder doctrine. "First degree felony murder is a killing during the course of a felony specified

30

ii. *The evidence did not warrant a false imprisonment instruction as a lesser included offense of kidnapping for robbery*

Kidnapping to commit robbery (§ 209, subd. (b)(1)) requires a finding the defendant intended to commit robbery and, consistent with that intent, took, held or detained another person by force or fear, moved the victim a substantial distance beyond that merely incidental to the commission of a robbery, and by that movement increased the risk of harm beyond that necessarily present in a robbery. (*People v. Martinez* (1999) 20 Cal.4th 225, 232; *People v. Robertson* (2012) 208 Cal.App.4th 965, 984-985.) The two elements of the test are related: "[W]hether the victim's forced movement was merely incidental to the [underlying offense] is necessarily connected to whether it substantially increased the risk to the victim." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152.) "[E]ach case must be considered in the context of the totality of its circumstances." (*Ibid.*)

False imprisonment, in contrast, requires only a finding that a person was unlawfully confined or restrained. Accordingly, false imprisonment is a lesser included offense of kidnapping to commit robbery. (See *People v. Eid, supra,* 59 Cal.4th 650, __; *People v. Shadden* (2001) 93 Cal.App.4th 164, 171.) A lesser included offense instruction on false imprisonment is not required when the evidence establishes that the defendant was either guilty of the greater aggravated kidnapping offense or was not guilty at all. (*People v. Kelly* (1990) 51 Cal.3d 931, 959.)

Washington asserts, based on the evidence presented about the beating and robbery of Segundo, a properly instructed jury could have found the People failed to prove the asportation element of kidnapping for robbery—that is, entertained a

---

in section 189, such as rape, burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189. . . .'" (*People v. Chun* (2009) 45 Cal.4th 1172, 1182.) Washington contends he was entitled to an instruction on second degree felony murder because the jury could have found he intended only "to injure or disable Mrs. Fouquet so he could burgle her home." Even under Washington's proposed theory, the killing during the course of a burglary would constitute first degree felony murder under section 189, not second degree felony murder.

reasonable doubt whether the movement of Segundo was substantial and not merely incidental to the robbery—and thus convicted him of the lesser offense of false imprisonment. In a different situation the movement of a victim from a front room to a bedroom and ultimately to a locked closet might justify a lesser included instruction on false imprisonment. (See, e.g., *People v. Mutch* (1971) 4 Cal.3d 389, 397-399 [movement of victims 30 to 40 feet through different rooms inside a business incidental to robbery]; *People v. Washington* (2005) 127 Cal.App.4th 290, 299 [movement of two bank tellers several feet within the bank was incidental to robbery]; *People v. Diaz* (2000) 78 Cal.App.4th 243, 247 ["incidental movements are brief and insubstantial and frequently consist of movement around the premises where the incident began"].) Here, however, the evidence was undisputed that, at the time Segundo was confined in the closet and unable to obtain medical attention for his significant head wounds, the robbery was ongoing, as Washington had not yet reached a point of temporary safety. (See *People v. Williams* (2013) 57 Cal.4th 776, 787 ["[b]ecause larceny is a continuing offense, a defendant who uses force or fear in an attempt to escape with property taken by larceny has committed robbery"]; *People v. Estes* (1983) 147 Cal.App.3d 23, 27-28.) There can be no question Segundo's confinement, not necessary to the robbery, increased the risk of harm far beyond that inherent in the robbery itself. Simply put, if the jury believed Washington was Segundo's assailant, there was no evidentiary basis on which it could have found him guilty of the lesser but not the greater offense. (See *People v. Dominguez, supra*, 39 Cal.4th at p. 1153 ["forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement" for aggravated kidnapping].) Accordingly, no false imprisonment instruction was warranted. (See *People v. Kelly, supra,* 51 Cal.3d at p. 959 [trial court did not err in refusing defendant's request to instruct on felony false imprisonment as lesser included offense of

kidnapping when evidence did not support it]; *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1233 [same].)[19]

> iii. *The court did not err in refusing to instruct on lesser included offenses of attempted extortion or false imprisonment in connection with the charge of kidnapping for extortion*

The crime of kidnapping to commit extortion requires a finding the defendant intentionally held or detained or confined a person to commit extortion. (§ 209, subd. (a).) Extortion is defined as obtaining the property of another with the other's consent when that consent has been induced by force or fear. (§ 518; see *People v. Ibrahim* (1993) 19 Cal.App.4th 1692, 1696; CALCRIM No. 1202.) Unlike other aggravated kidnapping offenses, asportation is not an element of kidnapping for extortion. (*People v. Mayfield* (1997) 14 Cal.4th 668, 771, fn. 10; *People v. Rayford* (1994) 9 Cal.4th 1, 14.) False imprisonment and attempted extortion are lesser included offenses of kidnapping to commit extortion. (*People v. Eid, supra,* 59 Cal.4th 650, __.)

Washington argues the jury should have been instructed on the lesser included offense of attempted extortion because the jury could have reasonably found he had failed to obtain the property that was the target of the crime. The ATM card, he asserts, was worthless without the correct PIN; and the money from the account was never taken. Washington acknowledges that at least one court has found a PIN to be property for purposes of extortion (see *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 867 [PIN number for debit card is "property" capable of being extorted]), but emphasizes he did not actually obtain Segundo's PIN. Accordingly, he argues, at most, he was guilty of an attempt crime.

Washington's argument is misplaced. While it is correct to commit the crime of extortion, rather than an attempt to extort, the defendant must obtain the targeted property (here either the PIN or the money) (see *People v. Goodman* (1958) 159 Cal.App.2d 54,

---

[19]    In addition to his arguments on instructional error, Washington also argues the evidence of asportation was insufficient to support the verdict. As explained, there was ample evidence to support the jury's verdict.

61; *People v. Franquelin* (1952) 109 Cal.App.2d 777, 784; see also *Scheidler v. Nat. Org. for Women* (2003) 537 U.S. 393, 404 [123 S.Ct. 1057, 154 L.Ed.2d 991 [interpreting New York extortion statute with identical elements]), the separate offense of kidnapping for ransom/extortion does not require the extortion be completed: ""There is a similarity between the completed crime of kidnapping for ransom and the attempt to commit the crime under section 1159, for in both situations the conduct does not need to be successful in bringing about the desired results. An attempt to commit a crime consists of (1) the specific intent to commit the crime, and (2) a direct but *ineffectual* act done toward its commission. [Citations.] The crime of kidnapping for ransom is complete when the kidnapping is done for the specific purpose of obtaining ransom even though the purpose is not accomplished. To define kidnapping for ransom otherwise would overlook the underlying gravity of the offense with an unwarranted emphasis on the success of the criminal activity." (*People v. Anderson* (1979) 97 Cal.App.3d 419, 425; see § 209, subd. (a); CALCRIM No. 1202 [obtaining property that is the target of kidnapping for extortion not an element of offense of kidnapping to extort].)

Washington also contends the court erred in failing to give a false imprisonment instruction as a lesser included offense of this aggravated kidnapping charge, but offers no argument as to how the jury reasonably could have found him guilty of the lesser but not the greater offense. As explained, his misplaced emphasis on the lack of asportation, which is not required for this offense, and the failure to obtain the correct PIN, are not a basis to find him guilty of the proposed lesser included offenses. No false imprisonment instruction was required.

7. *The Admission of DNA Hearsay Evidence Did Not Violate Washington's Sixth Amendment Right of Confrontation*

a. *Relevant proceedings*

Jody Hynds, a supervising forensic analyst employed by Orchid Cellmark, a private DNA testing laboratory in Texas, testified her company received for DNA analysis fingernail clippings taken from Fouquet's right hand, an oral swab of Washington's cheek containing his DNA and a blood card cutting from Fouquet

containing Fouquet's blood sample. Hynds articulated the laboratory's procedures for handling evidence and, in particular, the methods used to extract DNA from Fouquet's fingernail clippings. She explained the DNA obtained from the clippings contained more than one contributor of DNA with Fouquet being the major contributor. Using a computer program issued by the FBI called POPSTATS and a "probability-of-inclusion formula" that Hynds described as standard in the scientific community when samples contain mixtures of DNA, Hynds testified that Washington "could not be excluded" as a potential minor contributor of DNA, as his genetic typing was found at eight of 13 locations required for a DNA match. She explained, however, the amount recovered from underneath the nails was insufficient to conclusively establish the presence of Washington's DNA. The possibility of randomly selecting an individual in the Black population with the same genetic typing as the minor contributor to the DNA profile was one in 18,270.

On cross-examination Hynds acknowledged she did not handle the evidence or conduct the tests nor was she present when the tests were conducted. Rather, the technicians she supervised performed the tests; she reviewed the raw data from the tests along with the chain of custody and the controls used. Hynds then drew her own comparisons between the reference samples and the evidence samples and arrived at her own conclusions and statistical evaluations, which she prepared in a written report. (The report was introduced into evidence over Washington's confrontation clause objection.) The two-page report listed the samples tested, identified the tests performed and contained two charts comparing the statistical analysis of the DNA found with four population databases (Black, Caucasian, Southwest Hispanic and Southeast Hispanic.) No raw data were included in the report introduced into evidence by the People.[20]

b. *Governing law*

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const.,

---

[20]     The raw data were used by the defense as part of its cross-examination of Hynds.

6th Amend.)  The purpose of that clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." (*Maryland v. Craig* (1990) 497 U.S. 836, 845 [110 S.Ct. 3157, 111 L.Ed.2d 666].)  "A hearsay statement that otherwise satisfies a statutory exception may be admitted against a criminal defendant without violating the confrontation clause as long as the statement is not 'testimonial.'" (*People v. Lopez* (2012) 55 Cal.4th 569, 590 (*Lopez*), citing *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*).)[21]

Since its decision in *Crawford* the Supreme Court has struggled to identify a coherent test for courts to apply in identifying those statements that are testimonial in nature.  (See *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310, 324 [129 S.Ct. 2527, 174 L.Ed.2d 314] [evidence certificates prepared by laboratory analyst attesting substance was cocaine were testimonial; the statements "prepared specifically for use at petitioner's trial—were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment"]; *Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705, 180 L.Ed.2d 610] [certified blood alcohol report prepared by nontestifying laboratory analyst was testimonial]; but see *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221, 2240, 183 L.Ed.2d 89] (plur. opn. of Alito, J.) (*Williams*) [uncertified results of DNA analysis performed by nontestifying laboratory analysts were nontestimonial; the primary purpose was to capture an unidentified and dangerous rapist who was still at large, not to convict defendant].)

---

[21]    In *Crawford* the United States Supreme Court concluded that nontestimonial hearsay remains subject to state hearsay law and may be excluded from confrontation clause scrutiny entirely.  (*Crawford, supra,* 541 U.S. at p. 68.)  But where testimonial hearsay is involved, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Ibid.*)  While the Supreme Court declined to provide a comprehensive definition of "'testimonial'" (*ibid.*), the term includes "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at p. 52.)

Wrestling with the disparate opinions of a divided United States Supreme Court on this question,[22] the California Supreme Court has distilled two basic principles to be derived from the Supreme Court's most recent pronouncements: "Although the high court has not agreed on a definition of 'testimonial,' a review of [its] decisions indicates that a statement is testimonial when two critical components are present. [¶] First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. [Citations.] The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. [Citations.] [¶] Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be." (*Lopez, supra,* 55 Cal.4th at pp. 581-582; accord, *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*); see *People v. Mercado* (2013) 216 Cal.App.4th 67, 86.)[23]

---

[22] The plurality opinion in *Williams* was made up of the four dissenters in *Bullcoming* and *Melendez-Diaz* (Chief Justice Roberts and Justices Alito, Breyer and Kennedy) with Justice Thomas writing a separate concurring opinion deciding the question solely on the ground the lab report of the DNA tests lacked the solemnity of an affidavit or deposition. (See *Williams, supra,* 132 S.Ct. at p. 2260 (conc. opn. of Thomas, J.) Courts and commentators have lamented the lack of clear principles to be derived from the United States Supreme Court on this question. (See Justice M. Chin, et al., *Forensic DNA Evidence: Science and the Law* (Apr. 2014) § 11:10 [noting the *Williams* decision "revealed a severely fractured Court on the issues presented"]; *People v. Barba* (2013) 215 Cal.App.4th 712, 740 ["[m]aking sense out of the case law in this area is to some extent an exercise in 'tasseomancy'"]; see also *Williams,* at p. 2277 (dis. opn. of Kagan, J. ["[w]hat comes out of four Justices' [(the plurality)] desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's [(Thomas's)] one-justice view of those holdings is—to be frank—who knows what"].)

[23] The same day the opinions in *Lopez and Dungo* were filed, the Court also decided *People v. Rutterschmidt* (2012) 55 Cal.4th 650, which involved a laboratory director's testimony based on a report prepared by a nontestifying laboratory analyst who had conducted several tests on the victim's blood. The Court did not address whether the testimony violated the confrontation clause, concluding that, even if it did, due to the overwhelming nature of the evidence against the defendant, any error was harmless beyond a reasonable doubt. (*Id.* at p. 661.)

Focusing on only the first of these principles, in *Lopez* the Court found a lab supervisor could testify to blood alcohol results based on a report prepared by a nontestifying analyst without violating the confrontation clause because the report lacked the requisite formality and solemnity to be testimonial. (*Lopez, supra,* 55 Cal.4th at pp. 581-583 ["[w]e need not consider the primary purpose of nontestifying analyst Peña's laboratory report on the concentration of alcohol in defendant's blood because, as explained below, the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial"].) The parts of the report that consisted solely of machine data, the Court held, were not "statements"—"a machine cannot be cross-examined"—and thus did not implicate the defendant's Sixth Amendment right to confrontation. (*Id.* at p. 583.) The parts of the report containing data notes by the nontestifying analyst identifying categories of information such as "booking number" "subject's name" and the dates and time the samples were collected, the court concluded, though necessarily relied on by the testifying expert in reaching his own independent conclusions, were simply informal records for internal purposes; the nontestifying laboratory technician did not certify or attest to the contents of the report and thus they, too, were not testimonial. (*Id.* at pp. 584-585.)

In *Dungo* the Court considered whether a pathologist who did not perform the autopsy of the deceased could testify using the nontestifying pathologist's observations and factual descriptions of the deceased contained in the autopsy report. (*Dungo, supra,* 55 Cal.4th at pp. 620-621.) The court explained the objective factual observations and measurements recorded in an autopsy report, which was itself not admitted into evidence, as opposed to the conclusions of the cause of death, were not testimonial. More akin to medical records, the court explained, factual observations in autopsy reports lack the formality and solemnity of testimonial statements. (*Dungo,* at pp. 620-621, citing *Melendez-Diaz, supra,* 557 U.S. at p. 312, fn. 2 ["medical reports created for treatment purposes . . . would not be testimonial under our decision today"].) The Court also found the primary purpose of an autopsy report generally is not to supply evidence for a criminal case, even if a crime appears to have occurred and a suspect has been identified.

38

(See *Dungo,* at p. 620 ["the scope of the coroner's statutory duty to investigate is the same, regardless of whether the death resulted from criminal activity"].)

In the wake of *Williams, Lopez* and *Dungo,* several courts of appeal have rejected confrontation clause challenges to the testimony of a forensic supervisor who, like Hynds, relied on data resulting from tests performed by nontestifying laboratory technicians in arriving at his or her own conclusions. In *People v. Steppe* (2013) 213 Cal.App.4th 1116, 1127, the laboratory supervisor testified it was her job to "'review . . . all the notes, data, and the report of the DNA analyst and . . . ensure that the results are accurate and the conclusions are appropriate for th[e] items [tested]. It also includes doing an independent analysis of the data and interpretation and arriving at results and then comparing those results to the analyst's results to . . . ensure that it is accurate and the conclusions are appropriate for those items.'" (*Id.* at p. 1121.) Based on her review of the raw data, the testifying forensic analyst in *Steppe* opined that the murder victim was the major donor of the DNA to a bloodstain and explained the statistical probabilities that the defendant was a minor contributor. The *Steppe* court found the laboratory reports "lack[ed] the degree of formality and solemnity to be considered testimonial for purposes of the confrontation clause." (*Id.* at p. 1127.) Citing *Lopez,* the court found that was enough to determine no confrontation violation occurred. No analysis of the report's primary purpose, the court explained, need be undertaken. (*Steppe, supra,* 213 Cal.App.4th at p. 1123, fn. 8.)

Similarly, in *People v. Holmes* (2012) 212 Cal.App.4th 431, 436, 438, the court held "notes, DNA profiles, tables of results, typed summary sheets, and laboratory reports prepared by others" amounted to "unsworn, uncertified records of objective fact" and thus were not testimonial within the meaning of the confrontation clause. It, too, declined to conduct a primary purpose examination, finding the absence of the requisite formality and solemnity dispositive on whether the evidence was testimonial.

Our Division Eight colleagues in *People v. Barba* (2013) 215 Cal.App.4th 712 offered a more comprehensive analysis. The court found the DNA report lacking in the requisite formality and solemnity to be considered testimonial, but, unlike *Lopez, Steppe*

and *Holmes,* it did not end its analysis there.  Rather, it focused most of its attention on the primary purpose of DNA testing.  Echoing the views expressed in Justice Alito's opinion in *Williams*, the court found the primary purpose was not to accuse or inculpate a targeted individual but to perform tests in accordance with established protocols.  (*Barba,* at p. 741 ["DNA lab technicians in general perform their tasks in accordance with accepted procedures and have no idea beforehand whether their work will exonerate or inculpate a known suspect"]; *Williams,* 132 S.Ct. at p. 2244 (plur. opn. of Alito, J.) ["when the work of a lab is divided up in such a way [that numerous technicians work on each DNA profile,] it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures"].)  Moreover, the *Barba* court observed, "defendants who question the validity of DNA test results have an additional safeguard available through their power to subpoena anyone who took part in the DNA testing process."  (*Barba*, at pp. 742-743; see also *Williams, supra,* 132 S.Ct. at pp. 2243-2244 [same].)

c. *The trial court did not err in overruling Washington's confrontation clause objection to Hynds's testimony; and, in any event, any error was harmless*

Washington contends the admission into evidence of Hynds' testimony about tests she did not perform violated his right to confrontation under the Sixth Amendment.  Finding the analyses in *Steppe, Holmes* and particularly *Barba* persuasive as to the testimonial nature of DNA lab tests in light of recent opinions by the United States Supreme Court and the California Supreme Court, we conclude Hynds could testify as to her own opinions, based on data generated by multiple nontestifying lab technicians tasked with conducting tests in accordance with accepted procedures, without violating the confrontation clause.

Nevertheless, we need not rest our decision on that ground because any error in this regard was harmless beyond a reasonable doubt.  Hynds's testimony was hardly the bombshell Washington describes.  The DNA test from Fouquet's fingernails was far from conclusive, identifying Washington as a possible minor contributor of DNA (a statistical

probability of 1 in 18,270.) Quite apart from the DNA evidence, there was ample forensic evidence that Washington murdered Fouquet during a burglary. Washington's fingerprints were recovered at the Fouquets' home and Raymond Fouquet's jewelry was found in Washington's apartment. He also unsuccessfully attempted to use the Fouquets' ATM card. We have little difficulty concluding any error in admitting portions of Hynds's testimony that relied on data performed by nontestifying lab technicians was harmless beyond a reasonable doubt. (See *People v. Ruttershmidt, supra,* 55 Cal.4th at p. 661.)

### d. *Dr. Sathyavagiswaran's testimony did not violate the confrontation clause*

Washington also contends his Sixth Amendment rights were violated when the court permitted Dr. Sathyavagiswaran to refer to an autopsy report prepared by Dr. Scholtz. Dr. Scholtz prepared the report and testified at trial subject to rigorous cross-examination. Dr. Sathyavagiswaran was asked simply whether he agreed with Dr. Scholtz's conclusions, a proper function of expert testimony. Dr. Sathyavagiswaran did not refer to any conclusions made by a nontestifying witness. There was no confrontation clause violation.

### 8. *Washington Has Failed To Demonstrate Cumulative Error Compelling Reversal*

Washington contends the errors he described, at least when considered cumulatively, compel reversal. For the reasons we have explained, none of the errors he alleges (except with respect to his convictions for both rape and forcible sexual penetration), even when considered cumulatively, demonstrates a denial of due process. We reject his claim of cumulative error.

### 9. *The Sentence Must Be Modified To Strike the Parole Revocation Fine*

The trial court imposed a $10,000 parole revocation restitution fine pursuant to section 1202.45; the fine was suspended unless Washington violated parole. Washington argues, and the Attorney General agrees, this fine should be stricken because his sentence, as actually imposed, included only two consecutive LWOP terms (plus the great bodily injury enhancement on count 10) and a consecutive indeterminate term of

41

25-years-to-life. Determinate terms on all other counts were stayed. We agree. It is error to impose the parole revocation fine on a defendant sentenced to an LWOP term and an indeterminate life term with no determinate terms: Section 1202.45 is inapplicable when the sentence does not include a period of parole. (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 380 [striking parole revocation fine when defendant sentenced to death and no determinate term]; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1182 [striking parole revocation fine when defendant received only LWOP and indeterminate life sentences]; see *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine proper when defendant, in addition to being sentenced to death, also sentenced to an unstayed separate determinate prison term].)

10. *The Minute Order and Abstract of Judgment Do Not Accurately Reflect the Sentence Imposed*

As reflected in the trial transcript, on count 10, kidnapping for extortion, the court imposed a sentence of LWOP, plus five years for the section 12022.7, subdivision (c), enhancement, and stayed the section 12022.7, subdivision (a), enhancement pursuant to section 654. However, the minute order and the abstract of judgment erroneously state the LWOP sentence on count 10 was also stayed pursuant to section 654. Those clerical errors should be corrected to accurately reflect the court's sentencing pronouncements. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [trial court's oral pronouncements are best indicator of intent and prevail over clerk's minute order]; *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate court may order abstract of judgment corrected in order to accurately reflect the oral judgment of sentencing court].)

## DISPOSITION

The judgment is modified to strike count 9 and the $10,000 parole revocation fine and to reflect the trial court's imposition of an indeterminate sentence of life without parole plus five years under count 10, to run consecutively to the sentence impose on count 6. In all other respects the judgment is affirmed. The superior court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.

43